UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

| | |
|---|---|
| LEECLIFTON JEROME MOORE, ) | |
| ) | |
| Petitioner, ) | Case No. 1:09-cv-74 |
| ) | |
| v. ) | Honorable Robert Holmes Bell |
| ) | |
| CARMEN PALMER, ) | |
| ) | **REPORT AND RECOMMENDATION** |
| Respondent. ) | |
| _____ ) | |

This is a habeas corpus proceeding brought by a state prisoner, through counsel, pursuant to 28 U.S.C. § 2254. Petitioner is serving a nonparolable life sentence on his conviction for first-degree, felony murder, MICH. COMP. LAWS § 750.316(1)(b). The underlying felony was first-degree child abuse of a two-year-old victim. MICH. COMP. LAWS § 750.136(b)(2). The Kent County Circuit Court imposed sentence on February 20, 2006, after a jury found petitioner guilty of the felony-murder charge. By *per curiam* opinion issued September 20, 2007, a panel of the Michigan Court of Appeals affirmed the conviction, with one judge dissenting. The state Supreme Court denied discretionary leave to appeal by standard order entered January 30, 2008, with two justices dissenting.

The habeas corpus petition raises a single ground for relief: the trial court improperly instructed the jury by eliminating an essential element of the offense of felony murder and thereby denied petitioner due process of law. This claim was the subject of an objection at trial and was presented at all levels of the Michigan appellate system. Respondent has filed an answer to the

petition, supported by the state-court record. Petitioner's counsel has filed a reply brief, and the matter is ready for decision.

This case has been referred to me for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Upon review of the record, I conclude that the error in instructing the jury was harmless. I therefore recommend that the petition be denied.

## Proposed Findings of Fact

### A. Trial Court Proceedings

The state-court prosecution arose from the death of two-year-old Armon Colar in Grand Rapids, Michigan, on August 24, 2005, from massive injuries he received while in petitioner's care. Petitioner was charged with felony murder and appeared before the state district court for a preliminary hearing on September 7 and 23, 2005. After hearing testimony from the child's mother and the medical examiner, District Judge Benjamin Logan bound petitioner over as charged. (Prelim. Tr., docket #s 12, 13).

Jury trial commenced before Circuit Judge Dennis Kolenda on January 3, 2006. (*See* Trial Transcripts (TT), docket #s 14-18). At the outset of the trial, Judge Kolenda gave extensive instructions, including instructions on the elements of felony-murder and the lesser offense of manslaughter. (TT II, 3-33). With regard to the principal charge of first-degree murder on a felony-murder theory, the court instructed that the prosecution had the burden to prove three things. First, that petitioner caused serious physical injury to a child. Second, that he either (a) intended to cause serious physical harm to the child or (b) while he was inflicting harm on the child "he knew or appreciated that serious physical harm would result from what he did." (TT II, 30-31). Third, that

the child died as a result of the serious physical harm caused by petitioner. Judge Kolenda commented that the prosecutor need not prove that petitioner intended to kill the child or even that he appreciated that his conduct would result in death. "It doesn't matter, frankly, whether the child's death was an expected or unexpected consequence of the injury. . . . What has to be intended is the serious injury." (*Id.*, 32). No objection was raised by either party.

In opening statement, defense counsel admitted that petitioner had disciplined the child. (*Id.*, 50). He contended that the discipline could not have caused the child's injuries. Rather, he suggested that the child sustained the injuries during play with his sisters and that one of the girls had picked him up and dropped him on his head. (*Id.*, 52). Counsel contended that the boy's broken arm had occurred three or four days earlier, but that his mother had ignored it. (*Id.*). Finally, he suggested that the child's internal injuries were probably caused by petitioner accidentally, when he tried to administer CPR. (*Id.*, 55).

The child's mother, Alicia Colar, lived with petitioner, her boyfriend, and would occasionally leave her son and three and six year old daughters in his care. On the day before the child's death, two neighbors had observed petitioner swinging Armon around by his arms in a fashion that both believed to be dangerous for such a young child. (TT III, 46-47). One of the women, Carol Nichols, was so alarmed that she called Child Protective Services. (TT III, 4-5). She testified that petitioner swung the child around by his arms "just frantically around and around, real fast, whipping." (*Id.*). The man would put the child down, and then repeat the swinging periodically. The incident lasted about 45 minutes. (*Id.*, 6-8). The other witness, Joy Robinson, testified that petitioner was swinging Armon in the air, "that was not appropriate to be playin' with no baby like that." (*Id.*, 47). She observed the child was frightened and crying. (*Id.*, 47-48).

-3-

On the day of the child's death, his mother was visiting a neighbor to make some telephone calls. She received a call from petitioner telling her that something was wrong with Armon and asking her to come home. She drove back to the house and found Armon without any clothes on, cradled with petitioner on the couch. Petitioner was shaking the child hysterically telling him to wake up. Armon had blood coming from his mouth and his penis was swollen and was bleeding. (TT II, 70-88). They took Armon to the hospital, where he was placed in intensive care on life support. The child died the next day. At the hospital, Alicia Colar asked petitioner what had happened, and he said he had tried to perform CPR on the child, causing him to be bruised. (*Id.*, 72-74).

Joy Robinson testified that she heard loud noises from Colar's house on the morning and early afternoon of August 24, 2005. A baby was constantly crying. She heard a male voice telling the baby, "Shut the f--- up." She described the noise as "horrible" and that it sounded like someone was being slammed for an hour or so. Later, she saw Colar bring the baby out and place him in the front seat of the car. (TT III, 44-46). Neighbor Jeffery Maeweather corroborated Robinson's testimony, saying that he heard a man yelling "Shut the f--- up." The man sounded "upset, angry, mad." (TT III, 31-33).

Pathologist David Start, M.D., testified that Armon Colar was pronounced dead at 7:00 a.m. on August 25, 2005, the day after he was brought to the hospital. Dr. Start performed an autopsy on August 26, 2005. (TT III, 64). The medical records showed that Armon was in cardiac arrest when he arrived at the hospital. (*Id.*, 66). The child's body had multiple blunt force injuries to the head, chest, and back. (*Id.*, 70-73). There were a minimum of five blows to the head. (*Id.*, 74). The child suffered hemorrhaging in the head, brain axon damage, and retinal hemorrhaging,

all of which were a classic injury pattern for violent acceleration and deceleration applied to the head. (TT III, 74-77). The injuries were similar to those that might be incurred in an automobile accident or a fall from several stories. (*Id.*, 101-02). The child also suffered internal injuries to the chest and abdomen and a fractured rib, causing laceration to the liver. (*Id.*, 107-09). The child's right arm was broken just above the elbow, and the bone was "comminuted," or shattered. (*Id.*, 119). There were multiple abrasions and contusions on the back of the legs. (*Id.*, 118).

Detective Philip Betz took two recorded statements from petitioner, one at the police department on the evening of August 24, and the second the next day at the county jail. Petitioner acknowledged that he gave Armon a "whoopin'" with a belt across the back and buttocks and that when the child cried, petitioner told him to shut up. Petitioner denied kicking or punching the child or causing any injuries to him. He claimed, however, that the child became woozy and hit his head on the floor and lost consciousness, at which time petitioner attempted to perform CPR. (TT V, 31-39, 47, 56). Petitioner did not testify, but his statements to the detective were played for the jury.[1]

After the close of proofs, Judge Kolenda instructed the jury at length. Rather than instructing on the underlying felony (first-degree child abuse) and separately on the elements of murder, Judge Kolenda melded the elements of both crimes, instructing the jury that the prosecutor had the burden to prove four elements beyond a reasonable doubt in order to convict petitioner of felony murder. Because these instructions form the basis for petitioner's habeas corpus challenge, they are set forth verbatim here.

It's alleged that Mr. Moore murdered Armon in the course of subjecting him to the crime of child abuse in the first degree.

---

[1]Petitioner's statement does not appear in the record. The substance of his statement may be gleaned from the statements of counsel during final argument.

So there are now basically four things that are to be proven beyond a reasonable doubt by the evidence presented at this trial for you to say that you are satisfied that that charge of murder in the first degree, the felony murder form, has been established.

Number one, it has to be proven that Mr. Moore caused serious physical harm to a child. Statute says a child is anybody younger than 18. The statute also defines what it means by serious physical harm. And, it means this:

Any physical injury to a child -- remember, under 18 -- that seriously impairs the child's health or physical well-being, including, but not limited to, brain damage, a skull or bone fracture, a subdural hemorrhage or hematoma, a dislocation, a sprain, internal injury, poisoning, burn, scald, or severe cut.

The list isn't exclusive. It says, remember, including, but not limited to. If it's one of those things, it qualifies as a serious physical injury, and it can be a serious physical injury, even if it's something else, so long as it seriously impairs the child's health or physical well-being.

We're not talking about death. What we're going to talk about here, is that of a serious physical injury of the kind that I described was perpetrated and that death resulted.

The first thing that has to be proven is that Mr. Moore caused some serious physical harm or injury to a child. I've defined for you what that means in terms of serious physical harm. If it was done to someone under 18, then this first element has been proven.

But there are four elements. So proving one isn't enough.

The second thing which has to be proven is that Mr. Moore either -- that means one or the other of these need be proven, but not both -- intended to cause serious physical harm to the child or that he knew that serious physical harm would be caused by his actions.

The law does not make crimes out of the accidents. Therefore, for this crime to have occurred, Mr. Moore must have, number one, intended to strike the child, and then he must have also intended that, as a result, the child be seriously hurt physically or that he knew that the child would be seriously hurt, physically, by virtue of whatever conduct he was engaging in.

Now "intended" simply means that Mr. Moore wanted Armon to sustain serious physical injury. To know that that was going to happen means, even though

that's not what he wanted to happen, even though that's not what he planned to have happened, he was aware, appreciated, or understood that a serious physical injury would be the consequence of what he was doing to the child.

So he has to have intended that it happened, meaning he wanted a serious injury to happen or he knew that a serious injury would happen.

It's not sufficient for the evidence to satisfy you that, given all the circumstances, Mr. Moore should have known, been aware, appreciate, or figured out what were going to be the consequences. He has to have intended those consequences or actually have known that those were going to be the consequences, namely, serious physical injury.

Remember, one or the other is sufficient. Doesn't have to prove both. This intent doesn't have to be planned for a long time, or thought out ahead of time, or this knowledge doesn't have to be before anything happened, because that would make it premeditation. But he has to have, in time to have stopped, obviously, intended and then acted on the intent or known it was going to happen and acted on the knowledge.

Now both intent and knowledge can be proven circumstantially. Sometimes people announce in so many words what they're thinking. I mean to do this. I know this, et cetera. Or, sometimes afterwards they report to you what they thought. I intended for this to happen. I knew that that was going to happen, et cetera. But, they don't do that very often. That doesn't mean that you can't figure it out, though, or that it's an impossible issue to resolve here. It simply means you have to look at all the circumstances and try, if you can, to deduce what happened. Look at what was actually said, what was actually done, both before and after, for whatever that reveals to you about what was intended and/or known at -- at the time.

So, remember, the first thing that has to be proven is that serious physical harm was done to a child under 18. I guess there aren't children over 18. So, to a child, which means anyone under 18.

Number two, that it was -- that he struck the child intentionally and that he either intended the child was going to be seriously hurt or knew that the child would be seriously hurt. If one of those two things are established, then this second element has been proven.

The third thing that has to be proven is that at the time he injured Armon, if you decide that he did, Mr. Moore was caring for the boy. Now there doesn't have to be any formal arrangement with a parent. In fact, all that has to be proven is that

Mr. Moore was taking care of the boy, with or without his mother's permission, with or without an objection from her.

Now an argument -- I think Ms. Brinkman talked about -- has to be a guardian. Frankly, that suggests far more than the law requires. That suggests some kind of formal relationship. It simply required that the person who hurt the child be taking care of the child at the time. If he or she was, then we're talking about child abuse if the rest of these elements have been proven.

Now, if it's proven that Mr. Moore injured a child in a serious physical way, that he intended for that injury to occur or knew that it was going [to] occur, and that he was caring for the child at the time, that's child abuse in the first degree.

So if -- this is the fourth element, the child then dies as the result of the serious physical injury, it's murder, and murder in the first degree, because the statute says it happens in the course of committing child abuse in the first degree, then it's murder in the first degree. It does not have to be proven that Mr. Moore intended for the child to die or even that he appreciated that the injury would kill the child. He has to have intended serious physical injury, or he has to have known or been aware that serious physical injury would result. But that's as far as the intent element has to go. You don't have to know that death is also possible. Even if death is an unlikely consequence. But, it happens. If you intended serious physical injury or knew that serious physical injury was going to occur, and then death occurs, it's -- so long as it's not at the hands of somebody else, of course -- then we're talking about murder in the first degree.

So those are the things that have got to be proven. Causing serious physical harm to a child, doing it intending that such harm be caused, or at least knowing that such harm would result; taking care of the child at the time. Obviously, not doing a very good job of it. It's not that you're doing a good job. It's just you're the person taking care of the child and the common sense of taking care, and that the child dies from the injuries. If those four things have been proven, then murder in the first degree has been proven, and you're free to say so.

(TT V, 107-113).

Judge Kolenda then charged on the elements of the lesser offense of second-degree

murder. In this regard, he instructed the jury that if the jury were "not satisfied that [petitioner]

intended to seriously injure him or knew that injury would occur, it's murder in the second degree

if he appreciated that there was a high risk that what he was doing would result in serious injury to

the child." (TT V, 114). The court went on to explain "If serious injury was actually intended or if it was known that it would occur from what the person was deliberately doing, then we're talking about murder in the first degree. If it was only known that a serious injury would probably occur, then a resulting death is second-degree murder." (*Id.*). The court went on to charge concerning the elements of manslaughter, indicating that recklessness, "which means gross negligence," would suffice to satisfy the mental state for that crime. (*Id.*, 115).

The jury was excused but directed not to begin deliberations. After the jury was excused, the court asked for objections. Defense counsel remarked that the court "may have misspoke yourself when you were talking about first-degree murder the second time through." (TT V, 126). Counsel objected to the statement that the crime would still be first-degree murder "even if death was the unlikely consequence." Defense counsel objected to the "unlikely consequence" remark, but not to any other part of the instruction. (*Id.*, 126-27). The court overruled the objection, remarking that "if serious physical harm was inflicted intentionally or knowingly, and death resulted, even if unexpectedly, that does happen to be murder in the first degree once -- because we're piggybacking murder on the child abuse for that crime only." (*Id.*, 127).

After three hours of deliberation, the jury returned a verdict of guilty of murder in the first-degree. (TT V, 131-32).

B.    **Appellate Proceedings**

Petitioner appealed as of right to the Michigan Court of Appeals. His appellate brief, filed by appointed counsel, raised two issues for review. First, petitioner argued that the evidence concerning petitioner's violent swinging of the victim the day before the child's death was improper

evidence of prior bad acts admitted in violation of Michigan Rule of Evidence 404(b). Second, petitioner argued that the trial judge committed reversible error and denied petitioner due process by delivering an improper instruction on the mental element of felony murder by instructing the jury that petitioner could be convicted even if death was unintended and unexpected or an unlikely consequence of petitioner's acts. (Deft. Brief on Appeal, found in Michigan Court of Appeals record, docket # 20).

By unpublished, *per curiam* opinion issued September 20, 2007, two judges of the Court of Appeals affirmed the conviction. With regard to the claim of instructional error,[2] a majority found that Judge Kolenda had committed non-constitutional error in his instructions on the mental state required for a conviction. The court faulted the trial judge for combining his instruction on felony murder with the instruction on first-degree child abuse, finding that the instruction "completely obfuscated what the prosecution had to prove in the context of felony murder. Significantly, the trial court failed to instruct the jury on the malice element of felony murder or to instruct that malice could be inferred from the circumstances surrounding the incident." (Op., 4). The court went on to find, however, that petitioner did not demonstrate that it was more probable than not that the outcome would have been different in the absence of the error. Relying on a Michigan statute, MICH. COMP. LAWS § 769.26, the majority held that preserved, not non-constitutional instructional error requires reversal only if it affirmatively appears that the error complained of has resulted in a miscarriage of justice. Reviewing the trial evidence, the majority

---

[2] The court rejected petitioner's challenge to the introduction of evidence concerning the previous day's incident of abuse, concluding that this event was part of the "res gestae" of the charged crime and so was not governed by Mich. R. Evid. 404(b). (Op., 1-3).

found that petitioner had not demonstrated that the instructional error was outcome determinative. (Op., 4-5).

Judge Helene White dissented, finding that an error in omitting an element of the felony murder instructions is an error of constitutional magnitude under state law. Judge White asserted that the trial court failed to instruct on the malice element of felony murder and that the instructions as delivered did not fairly present the issues to be decided.

Petitioner sought discretionary review in the state Supreme Court. By standard order entered January 30, 2008, the state Supreme Court denied leave to appeal. Justices Cavanaugh and Kelly noted that they would grant review. (Michigan Supreme Court record, docket # 21).

## **Applicable Standard**

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 131 S. Ct. 733, 739 (2011); *Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009); *Holder v. Palmer*, 588

F.3d 328, 341 (6th Cir. 2009) ("'[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)).

AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Harrington*, 131 S. Ct. at 786. Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted). A federal court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from

Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Hoffner v. Bradshaw*, 622 F.3d 487, 495 (6th Cir. 2010).

## **Discussion**

### I.    **Nature of the Instructional Error**

The judges of the Court of Appeals panel unanimously found that the trial court committed instructional error in explaining the required mental state for felony murder. Two of the judges concluded that the error was non-constitutional and that it did not require reversal. The dissenting judge believed that the error was both constitutional and prejudicial. The role of a habeas court is not to review the decisions of the state appellate courts on issues of state law. Consequently, this court must assume that the trial court's instructions violated state law. However, this does not necessarily entitle petitioner to relief. "The fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). The core question for a habeas court is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). To determine whether the trial courts' instructions meet this due-process standard, it is necessary for this court to understand the requirements of state law concerning the crime of conviction, first-degree felony murder. The court must then determine whether the decision of the Court of Appeals, which expressly addressed and resolved the issue whether the instructional error had a prejudicial impact, withstands scrutiny under the AEDPA standard.

Under Michigan law, first-degree murder is a statutory offense. The first-degree murder statute, MICH. COMP. LAWS § 750.316, describes two distinct types of first-degree murder. The first is "deliberate and premeditated" murder. The statutory crime of first-degree, premeditated murder is committed only if the defendant entertains the specific intent to kill. *See People v. Garcia*, 247 N.W.2d 547, 550 (Mich. 1976). In addition, the prosecutor must prove deliberation and premeditation. *People v. Langworthy*, 331 N.W.2d 171, 179 (Mich. 1982).

Petitioner in the present case was convicted of the second type of first-degree murder, called "felony murder." The first-degree murder statute provides that murder committed in the perpetration of certain enumerated felonies, including child abuse in the first-degree, is punishable as first-degree murder. MICH. COMP. LAWS § 750.316(b). *People v. Aaron*, 299 N.W.2d 304 (Mich. 1980), is the leading Michigan case on first-degree felony murder. In *Aaron*, the Michigan Supreme Court abandoned the common-law felony murder rule, which had permitted the element of malice required for murder to be satisfied by the intent to commit the underlying felony. The *Aaron* court held that to be convicted of felony murder, the defendant must nevertheless have malice. The malice requirement is satisfied only if the actor (1) intended to kill, or (2) intended to inflict great bodily harm or (3) acted with wanton and wilful disregard of the likelihood that the natural tendency of the defendant's behavior was to cause death or great bodily harm. *Id.* at 326; *see People v. Dykhouse*, 345 N.W.2d 150, 151 (Mich. 1984). The intent to commit the underlying felony, standing alone, is not enough to establish the state of mind required for felony murder. *See People v. Dumas*, 563 N.W.2d 31, 34 (Mich. 1997). The fact that a murder is committed in the perpetration of one of the

enumerated felonies elevates second-degree murder to first-degree murder, without the necessity for the prosecutor to prove the specific, premeditated, and deliberate intent to kill. *Id.*[3]

First-degree child abuse is one of the felonies enumerated in the first-degree murder statute. MICH. COMP. LAWS § 750.316(b). A person is guilty of child abuse in the first degree if he knowingly or intentionally causes serious physical or serious mental harm to a child. MICH. COMP. LAWS § 750.136b(2). This is a specific intent crime. The prosecution must establish not only that the defendant caused serious injury to a child, but also that he intended to commit the act *and* that he intended to cause serious physical harm or knew that serious physical harm would be caused. *People v. Maynor*, 683 N.W.2d 565, 568 (Mich. 2004).

A conviction for first-degree felony murder obviously requires the jury to find beyond a reasonable doubt all of the elements of the underlying felony (in this case first-degree child abuse) in addition to all of the elements of common-law murder. Most Michigan trial courts instruct on felony murder in the fashion suggested by the Michigan Standard Criminal Jury Instructions, even though these instructions are unofficial and are not binding on the courts. *See* MICH. CRIM. J. INST. (ICLE, 2d ed. 2009). The standard jury instruction for first-degree felony murder sets forth the elements for common-law murder, followed by the elements for the underlying felony:

> (1) The defendant is charged with first-degree felony murder. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt:
> (2) First, that the defendant caused the death of [*name deceased*], that is, that [*name deceased*] died as a result of [*state alleged act causing death*].

---

[3] The effect of the *Aaron* decision is to require that a first-degree murder conviction on a felony-murder theory be supported by the jury's finding of common-law malice, consisting of one of the three mental states noted above. Common-law malice is required for a conviction for second-degree murder, a common-law offense. *Aaron*, 299 N.W.2d at 326.

(3) Second, that the defendant had one of these three states of mind: [he/she] intended to kill, or [he/she] intended to do great bodily harm to [*name deceased*], or [he/she] knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of [his/her] actions.

(4) Third, that when [he/she] did the act that caused the death of [*name deceased*], the defendant was committing [(or) attempting to commit / (or) helping someone else commit] the crime of [*state felony*]. For the crime of [*state felony*], the prosecutor must prove each of the following elements beyond a reasonable doubt: [*state elements of felony*].

(5) Fourth, that the killing was not justified, excused, or done under circumstances that reduce it to a lesser crime.

2 MICH. CRIM. J. INST. 2d § 16.4. An instruction following this method would set forth two required, and very similar, mental elements attending the same assaultive conduct. This is because Michigan law allows the same act that constitutes the predicate felony to constitute the act of felony-murder. *People v. Magyar*, 648 N.W.2d 215, 217-18 (Mich. Ct. App. 2002); *see also People v. Mata*, No. 286173, 2009 WL 5150244, at * 4 (Mich. Ct. App. 2009) (the Legislature "intended the same acts used to prove the predicate offense of first-degree child abuse to be used to prove the murder itself"). To be guilty of first-degree child abuse, the defendant must have intended to cause serious physical harm or known that serious physical harm would result. *Maynor*, 683 N.W.2d at 568. To be guilty of murder, the defendant must have intended to kill, intended to cause great bodily harm, or wantonly disregarded that death or great bodily harm would be the natural consequence of his acts. *People v. Goecke*, 579 N.W.2d 868, 878 (Mich. 1998).

If Judge Kolenda had followed the standard instruction, the state appellate court would probably have found no error. Judge Kolenda, however, was an outspoken critic of the standard jury instructions. He was well known for his opinion that the standard instructions are too cursory and not well tailored to the facts of any particular case. In fact, one of the principal decisions of the Michigan Supreme Court on the question of jury instructions in a murder case was the result

of the trial court's delivery of standard jury instructions on first-degree murder, over the objections of defense attorney Dennis Kolenda, who had tendered to the court instructions specially written for the case. *People v. Dykhouse*, 345 N.W.2d 150 (Mich. 1984). When he was elected to the circuit bench in 1988, Judge Kolenda began to craft his own instructions and to deliver them in plain language, rather than reading the standard instructions.[4]

Instead of instructing the jury on two separate mental elements pertaining to the same conduct, the trial judge, in the words of the Michigan Court of Appeals, "combined its instructions on felony murder with its instructions on first-degree child abuse." (Op., 4). This was possible because the required mental elements for these crimes are extremely similar, although not perfectly identical:

| Murder | First-Degree Child Abuse |
|---|---|
| Intent to kill | --- |
| Intent to cause great bodily harm | Intent to cause serious physical harm |
| Wanton disregard of likelihood that death or great bodily harm is likely | Knowledge that act will cause serious physical harm |

Judge Kolenda's instruction concerning *mens rea* essentially directed a verdict in favor of petitioner on the first alternative mental state for murder -- the intent to kill -- as this mental state was never mentioned. The judge did, however, dwell at great length on the other two possible mental states, for which there is obvious overlap between murder and first-degree child abuse. The elements of an "intent to cause great bodily harm," and "intent to cause serious physical harm" are nearly

---

[4] Petitioner's appellate attorney referred to this as Judge Kolenda's "habit" of delivering instructions "in a somewhat extemporaneous fashion." (Def. Brief on Appeal at 16, found in docket # 20).

identical under state law. The technical difference is discussed in section III below. The third alternative for murder, sometimes called "depraved heart murder," *see Goecke*, 579 N.W.2d at 878, is less demanding than the analogous mental state for first-degree child abuse. Depraved heart murder requires only that the actor have acted with wanton and wilful disregard that his conduct is likely to cause death or great bodily harm. *Id.* By contrast, first-degree child abuse requires that the actor have actual knowledge -- not merely reckless disregard -- that his conduct will cause serious physical harm. In this regard, the *mens rea* requirement for first-degree child abuse is more exacting than that for depraved heart murder. This is not unusual in Michigan law. *See, e.g., People v. Brown*, 703 N.W.2d 230, 237-38 (Mich. Ct. App. 2005) (*mens rea* for murder can be less than mental state required for assault with intent to commit murder).[5]

It is therefore not accurate to say that Judge Kolenda completely omitted instructions on the required mental element for murder. Rather, because of the substantial similarity between two of the alternative mental states for murder and those necessary to establish first-degree child abuse, he melded the alternative mental elements to simplify the task of the jury. The state Court of Appeals found his effort unsuccessful, as a matter of state law. The question for this court is whether the admitted instructional error so infected the fairness of the trial as to constitute a due-process violation.

---

[5] In his final argument to the jury, defense counsel correctly acknowledged that the mental state required for murder is less than that required for first-degree child abuse. (TT V, 57 at lines 10-13).

## II.    Structural Error?

Petitioner's counsel strenuously argues that the error in this case must be deemed a structural defect, and therefore grounds for habeas corpus relief regardless of the effect or lack of effect on the jury's verdict.  This contention is untenable.

Structural errors are defects that fundamentally undermine the reliability and fairness of a trial and therefore are not subject to harmless-error analysis.  *See Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991).  The list of constitutional deprivations that the Supreme Court has found to be structural defects is necessarily short, as such defects affect the framework in which the trial itself proceeds, rather than representing an error in the trial process.  For example, a total deprivation of the right to counsel is deemed a structural defect, *see Gideon v. Wainwright*, 372 U.S. 335 (1963), as is the denial of hired counsel of the defendant's choice, *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), and partiality of the trial judge.  *Fulminante*, 499 U.S. at 309.  Other fundamental errors not subject to harmless-error analysis include unlawful exclusion of members of the defendant's race from a grand jury, abridgement of the right of self-representation at trial, and abridgement of the right to a public trial.  *Id.* at 310.  Beyond that, the Supreme Court has found an error to be structural, and thus subject to automatic reversal, only in a "very limited class of cases."  *Johnson v. United States*, 520 U.S. 461, 468 (1997); *see Hedgpeth v. Pulido*, 129 S. Ct. 530, 532 (2008) (*per curiam*) (structural errors "are the exception and not the rule"); *accord Washington v. Rencuenco*, 548 U.S. 212, 218 (2006) ("most" constitutional errors can be harmless).

In the area of defective jury instructions, the principal Supreme Court case finding structural error is *Sullivan v. Louisiana*, 508 U.S. 275 (1993).  In *Sullivan*, the trial court gave the jury a defective reasonable doubt instruction in violation of the defendant's Fifth and Sixth

Amendment rights to have the charged offense proved beyond a reasonable doubt. The Supreme Court concluded that the error was not subject to harmless-error analysis because it "vitiates *all* the jury's findings," 508 U.S. at 281, and produces "consequences that are necessarily unquantifiable and indeterminate." *Id.* at 282.

By contrast, the Supreme Court has never treated errors in describing the elements of an offense as structural errors. The plainest example of this is *Neder v. United States*, 527 U.S. 1 (1999), in which the trial court refused to submit the issue of materiality to the jury in a tax fraud prosecution, believing that the issue framed a question of law for the court and was not an element of the offense itself. The Supreme Court found that materiality is indeed an element of the offense and that the trial court erred in not submitting this necessary element to the jury. The Court went on to hold, however, that omission of a necessary element does not constitute structural error, as it does not "*necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." 527 U.S. at 9. In reaching this result, the *Neder* Court distinguished and narrowed the holding in *Sullivan*. The Court remarked that the error in *Sullivan* vitiated all the jury's findings, while the failure to instruct on materiality only affected the jury's finding on one necessary element. *Id.* at 11; *see Hedgpeth*, 129 S. Ct. at 532 ("*Neder* makes clear that harmless-error analysis applies to instructional errors so long as the error at issue does not categorically vitiate *all* the jury's findings."). The Court went on to reject the alternative reasoning set forth in the *Sullivan* opinion, which had suggested that structural error would be found whenever the error prevented the jury from rendering a "complete verdict" on every element of the offense. The Court rejected the alternative reasoning in *Sullivan* on the ground that "it cannot be squared with our harmless-error cases." 527

U.S. at 11.  The Court likened the omission of a necessary element to a defective instruction on a necessary element, which has never been deemed structural error.  *Id.* at 11-13.

As the Supreme Court stated in *Neder*, harmless-error analysis has always applied to an improper instruction regarding an element of the offense.  For example, in *Rose v. Clark*, 478 U.S. 570 (1986), the Court faced the question whether the harmless error standard applies to defective jury instructions concerning the requisite mental state for murder.  The Tennessee trial court had instructed the jury on both first and second-degree murder, informing them that second-degree murder requires proof of malice but not of planning or premeditation.  The court then instructed the jury that "all homicides are presumed to be malicious in the absence of evidence which would rebut the implied presumption."  *Id.* at 574.  The Court found that this instruction constituted error under *Sandstrom v. Montana*, 442 U.S. 510 (1979), which condemned instructions directing a jury to presume malice from predicate facts.  Although *Sandstrom* was designed to assure that the prosecution prove every element of the offense beyond a reasonable doubt, the Court nevertheless concluded that *Sandstrom* error is subject to harmless-error analysis.  478 U.S. at 579-80.  The Court remarked:  "Placed in context, the erroneous malice instruction does not compare with the kinds of errors that automatically require reversal of an otherwise valid conviction."  *Id.* at 579.  The Supreme Court has routinely applied harmless-error analysis to cases involving improper instructions on a single element of the offense.  *See, e.g., Carella v. California*, 491 U.S. 263 (1989) (*per curiam*) (mandatory conclusive presumption concerning intent to commit theft by fraud); *Pope v. Illinois*, 481 U.S. 497 (1987) (misstatement of necessary element in obscenity prosecution); *see also Washington v. Rencuenco*, 548 U.S. at 222 (failure to submit an element to the jury "is not structural error");

*Johnson v. United States*, 520 U.S. at 469 (improperly instructing the jury on an element of the offense is subject to harmless-error analysis).

The closest Supreme Court case to the present case on the facts is *California v. Roy*, 519 U.S. 2 (1996). Petitioner Kenneth Roy was convicted of robbery and first-degree murder on the theory that Roy came to the aid of a confederate who was trying to rob the victim, whom he then helped to kill. The trial judge gave the jury an instruction that permitted it to convict Roy of first-degree murder as long as the jury concluded that Roy "with knowledge of" the confederate's unlawful purpose of robbery helped the confederate by act or advice in the commission of the confederate's crime. The California Supreme Court held that an identical instruction was erroneous under state law, which required the jury to find that Roy had not only the knowledge, but also "the intent or purpose" of encouraging or facilitating the confederate's crime. *Id.* at 3. The issue for the United States Supreme Court was whether this erroneous instruction, which involved the misdescription of the mental element of the crime under state law, was a structural error that defies harmless-error analysis. The Court found that misdescription of an element of the offense is not structural error and that the harmless-error standard of *Brecht v. Abrahamson*, 517 U.S. 619 (1993), should have been applied by the habeas court in determining whether to grant relief. 519 U.S. at 5.[6]

Under the foregoing holdings of the United States Supreme Court, the instructional error in the present case may not be deemed structural and is clearly subject to harmless-error

---

[6] The closest Sixth Circuit authority, *United States v. Kuehne*, 547 F.3d 667, 679-82 (6th Cir. 2008), is to the same effect. The *Kuehne* court found that the trial judge's failure to instruct on the elements of the predicate drug offense supporting a section 924(c) charge was erroneous but was subject to harmless-error review. *See also Lawrence v. 48th Dist. Ct.*, 560 F.3d 475, 484 (6th Cir. 2009) (affirming denial of habeas relief for instructional error on necessary element of intent because it was harmless).

analysis. The most egregious case of instructional error faced by the Court was *Neder*, in which the jury was not instructed at all on an essential element of the offense. The Court nevertheless held that harmless-error analysis applies. 527 U.S. at 9. Hence, if Judge Kolenda had completely omitted instructions on mental state, *Neder* would require application of harmless-error analysis. But Judge Kolenda did not fail to instruct the jury on the issue of mental element. He repeatedly told the jury that the prosecution was required to prove beyond a reasonable doubt that petitioner intended to cause his victim serious physical harm or that he knew that his actions would cause serious physical harm. The state Court of Appeals held that these instructions did not properly reflect the requirements of Michigan law for malice in a murder case. Thus, this case is indistinguishable from *California v. Roy*, where the trial court likewise misstated the *mens rea* requirement under state law. The Court's holding in *Roy*, and every other relevant Supreme Court case, requires that this error be analyzed under the harmless-error standard.

Petitioner's counsel nevertheless strenuously argues that the error in this case is structural. In doing so, he relies on *Sullivan v. Louisiana*. This argument is untenable in light of the Court's subsequent ruling in *Neder*, in which the Court distinguished *Sullivan* and held that the complete omission of a jury instruction on a necessary element of the offense must be analyzed under the harmless-error standard. Petitioner's counsel recognizes the destructive effect of *Neder* to his argument, so then shifts his reliance to Justice Scalia's dissent in that case. (Reply Brief, docket # 23, at 2-3). A decision in habeas corpus case, however, must be grounded on the *holdings* of the United States Supreme Court. *See Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004). *A*

*fortiori*, this court would err if it refused to follow clear Supreme Court holdings, such as those in *Roy* and *Neder*, in reliance on the dissent of one justice.[7]

In summary, the instructional error in this case involves a misdescription under state law of an element of the offense and therefore is subject to clear-error analysis under the holdings of relevant Supreme Court cases.

### III.     Harmless Error Analysis

In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Supreme Court held that the proper standard for habeas review of constitutional trial errors is not the reasonable-doubt standard applied in cases on direct review. Rather, habeas relief may be granted only if the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637-38. This is the *Kotteakos* standard, which the Supreme Court had fashioned for review of non-constitutional trial errors in the federal system. *Kotteakos v. United States*, 328 U.S. 750, 776 (1946). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). The *Brecht* Court determined that this standard, which imposes a higher burden on habeas petitioners, better serves the important interest of finality of state criminal judgments. *Brecht*, 507 U.S. at 637. The *Brecht* standard applies on habeas corpus review regardless of whether the state courts applied harmless-error analysis. *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (federal

---

[7] Similarly, petitioner's reliance on a thirty-year-old decision of the Sixth Circuit, *Glenn v. Dahlman*, 686 F.2d 418 (6th Cir. 1982), is an invitation to error. *Glenn* is pre-AEDPA, is contrary to *Neder*, and, in any event, cannot form the basis for habeas corpus relief. *See Renico v. Lett*, 130 S. Ct. 1855, 1866-67 (2010).

habeas court is to apply *Brecht*'s harmless-error standard regardless of whether state courts recognize the error or reviewed for harmlessness beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18 (1967)).[8]

The *Brecht* inquiry requires this court to determine whether the erroneous instruction had a "substantial and injurious effect or influence" on the decision of the jury that petitioner was guilty of murder. *Brecht*, 507 U.S. at 623. This inquiry requires the court to focus on the precise nature of the instructional error in light of the evidence produced at trial. *See O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). If the habeas court is left with "grave doubt" whether the error was harmless, the decision must be for the petitioner. *Id.* at 435-36. In the present case, the issue is not even close.

As noted above, the instructional error in this case did not involve complete omission of a necessary element of the offense. The jury was extensively instructed on the issue of *mens rea*, but the instructions did not completely conform to Michigan law. When an instruction on a necessary element is completely omitted, the court's role is to determine whether the omitted element is supported by "uncontroverted evidence." *Neder*, 527 U.S. at 18. That is, the habeas court must look at the record evidence as a whole and predict whether a properly instructed rational jury would have found the omitted element beyond a reasonable doubt. *See, e.g., Jenkins v. Nelson*, 157 F.3d 485, 494-95 (7th Cir. 1998). This process can be uncomfortable for a reviewing court, as it resembles a verdict by judges rather than by jury. *See, e.g., Monsanto v. United States*, 348 F.3d

---

[8] Because of the Supreme Court's holding in *Fry*, petitioner's argument that the state Court of Appeals erred in reviewing the instructional error only for a miscarriage of justice is of no moment. *See Ruelas v. Wolfenbarger*, 580 F.3d 403, 411-12 (6th Cir. 2009) ("*Brecht* is always the test" regardless of the standard applied in state appellate court).

345, 350-51 (2d Cir. 2003). Where, as here, the necessary element was not completely omitted but was merely misdescribed, the analysis may be much simpler. Even in *Sullivan*, the Supreme Court acknowledged that instructional error concerning a necessary element can indeed be harmless where other facts necessarily found by the jury are the "functional equivalent" of the omitted or misdescribed element. *See Sullivan*, 508 U.S. at 281; *accord*, *Neder*, 527 U.S. at 13. In such a case, the habeas court need not speculate concerning the verdict that might be rendered by a hypothetical jury. Rather, the court may focus on what the jury in the present case actually found under the instructions as given and then determine whether, despite the erroneous instruction, the jury's findings were the functional equivalent of a finding of common-law malice.[9]

Applying this test, I find that any state-law error in describing the required mental state for murder was harmless, as it could not have had a substantial and injurious effect or influence on the jury's verdict. This is because Judge Kolenda's instructions were close enough to the requirements of Michigan law for malice that the jury must have found the required mental state on the facts of this case. As noted in section I above, common-law malice may be established in three alternative ways. The first is by showing the intent to kill. The trial court's instructions did not mention this alternative, an error that inured to the petitioner's benefit. The failure to instruct on intent to kill essentially directed a verdict in petitioner's favor on this alternative mental state. Common-law malice can also be established by proof that the defendant intended to cause "great bodily harm." Judge Kolenda instructed that the prosecution had the burden of proving that

---

[9] Even Justice Scalia (whose views petitioner asks this court to espouse because they establish the highest hurdle for the state to clear in cases such as this) endorses this analysis. "The error in the present case can be harmless only if the jury verdict on other points effectively embraces this one or if it is impossible, on the evidence, to have found what the verdict *did* find without finding this point as well." *California v. Roy*, 519 U.S. at 7 (Scalia, J., concurring).

petitioner intended to cause "serious physical harm." Alternatively, the malice element may be satisfied by wanton disregard that the defendant's actions will naturally cause death or "great bodily harm." In place of this concept, the trial court instructed that petitioner must have acted knowing that his conduct would cause "serious physical harm."

Both the dissenting appellate judge and petitioner's counsel point out that "great bodily harm" and "serious physical harm" are not synonymous under Michigan law. They are, however, extremely close in meaning. "Great bodily harm" is a common-law concept. The Michigan courts define great bodily harm as "serious injury of an aggravated nature." *People v. Ochotski*, 73 N.W. 889, 892 (Mich. 1898); *People v. Brown*, 703 N.W.2d 230, 236 (Mich. Ct. App. 2005) (citing *People v. Mitchell*, 385 N.W.2d 717, 718 (Mich. Ct. App. 1986)). The child-abuse statute contains the following definition of "serious physical harm":

> any physical injury to a child that seriously impairs the child's health or physical well-being, including, but not limited to, brain damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut.

MICH. COMP. LAWS § 750.136b(f). The statutory definition of serious physical harm overlaps the concept of great bodily harm and includes injuries that would certainly qualify as great bodily harm, that is, serious injury of an aggravated nature, such as brain damage, a skull fracture, and internal injury. At the same time, the statutory definition is somewhat more inclusive, as it comprehends injuries (such as dislocation or sprain) that would not constitute great bodily harm. Judge Kolenda read the statutory definition to the jury during final instructions. (TT IV, 108).

The harmless error inquiry therefore turns on the question whether the difference between great bodily harm and serious physical harm misled the jury, such that the inaccurate

instruction had a "substantial and injurious effect or influence" in determining the jury's verdict. *Brecht*, 507 U.S. at 637. The incorrect instruction could have this prejudicial effect only if the proofs allowed the jury to find that petitioner intended to inflict only minor injuries (such as a sprain or dislocation), which would qualify as serious physical harm but not great bodily harm. If, however, under the facts of the case, the jury found that petitioner intended to inflict (or had knowledge that he would inflict) the kind of injuries that fall within the broad overlap between great bodily harm and serious bodily injury, the instructional error must be deemed harmless.

Given the evidence in this case, and the massive nature of Armon's injuries, it is impossible that the jury found an intent to inflict, or knowledge of, only the species of serious physical harm (such as a sprain or dislocation) that would fall within the statutory definition of serious physical harm but would be too minor to constitute great bodily harm. The evidence supported a finding that the beating lasted approximately an hour. Armon's injuries were so severe that his heart had stopped by the time he reached the hospital. He had multiple blunt force injuries to the head, chest and back and had been struck in the head at least five times. He suffered brain hemorrhages, retinal hemorrhaging, and brain axon damage. The child's penis and scrotum were cut deeply from being lashed by a belt. The child also suffered internal injuries to the chest and abdomen, causing a fractured rib and damage to the liver, as well as ruptures to the bowel. The bone in his right arm was shattered, an injury that the doctor said would require multiple impacts. The jury obviously found that petitioner inflicted these injuries. The likelihood that the jury concluded that petitioner's only intent was to inflict a sprain, dislocation, or other injury not severe enough to qualify as "great bodily harm" is nil.

In an effort to avoid this result, petitioner argues that the mental element of murder was "the contested element at trial" and was "the only issue that mattered." (Reply Brief, docket # 23, at 2, 3). This argument is unavailing. Although petitioner's mental state was indeed an issue in the case, no one contended that he meant only to inflict minor injuries. Defense counsel argued that petitioner's youth, inexperience with children, and the overwhelming circumstances he faced when the child was injured made petitioner incapable of forming either of the requisite specific intents (intentionally or knowingly). (Final Argument, TT V, 45-46). The jury obviously rejected this argument; if they accepted it, they would have acquitted petitioner. But mental state was clearly not the only contested element at trial, let alone the only one that mattered. The principal defense was that the child's injuries had been inflicted by his siblings during play, that the broken arm, cut penis, and head injuries were preexisting and had not been inflicted by petitioner, and that the internal injuries were accidental, sustained as a result of petitioner's efforts at CPR. (*Id.*, 49 ("The injuries to the penis were preexisting."); 49-50 ("We know the arm was injured two, three days prior."); 51 ("There is no way Lee would know the darn thing was broke."); 52 ("He never even heard that shaking can cause an injury like that."); 53 ("There's bruises in the abdomen area, and there's a broken seventh rib. How the doctors say he got the broken seventh rib? Compression, squeezing. Simple. How did Lee say -- say what he was doing? He was doing CPR."); 54 ("I submit to you it is reasonable that that is when the liver damage occurred. Completely unknowingly to Lee. He's actually trying to save the baby at that point in time. Save the boy, not kill him. Not intentionally cause harm."); 57 ("So, now, you will have to decide, then, whether these actions, as I have outlined them here, are sufficient to cause this knowingly high degree of risk of death. That means you knew, when you are pushing on the stomach, it's gonna split the liver or have some idea it will do that.");

58 ("Remember, now they thought there was a -- they thought there was some bruise on the head that was because of a little fall in the tub a couple days earlier.")).  Had the jury accepted these propositions -- that the injuries were preexisting or accidental -- they would have acquitted.  The instructions had no bearing on their decision on this issue, which was truly *the* issue in the case, not some nuanced debate on *mens rea*.

In summary, to find petitioner guilty under the instructions as delivered and the proofs as presented, the jury must have found that petitioner inflicted the child's fatal injuries (*i.e.*, that they were not preexisting) and that petitioner intentionally or knowingly did so (that is, that the injuries were not accidental).  These findings were the functional equivalent of a finding of malice.  The fact that the instructions on the required mental element were over-inclusive and would have allowed a guilty verdict on a finding of an intent to inflict "serious" but not "great" harm might have misled the jury in another case, involving other facts, but not this case.

## Conclusion and Recommended Disposition

Applying the *Brecht* standard, I find that the instructional error was harmless, as it did not have a substantial and injurious effect on the verdict.  The erroneous instructions were therefore not prejudicial, and no due-process violation occurred.  I recommend that the petition be denied on its merits.

Dated:  May 5, 2011                              /s/  Joseph G. Scoville
                                                 United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). General objections do not suffice. *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).